Good morning, Your Honors. This is Gregory Baruch with Berrien Baruch for the Plaintiff Appellants. I'd like, if I may, to reserve three minutes. Your Honors, there are five points I'd like to make here. First, the District Court erred when it found that insurance purchasers didn't have standing because they, because according to the court, they alleged only the injury that occurs when the car is repaired. We contend we clearly allege an overcharge at the time of purchase as shown in our complaint paragraphs 4, 9, 34, 80-81, and 96. Second, these are traditional antitrust allegations. The Ninth Circuit in the Kneveld Bar decision said that an agreement not to compete on terms is the same as price fixing, and that's at 232 F3rd at 990 Note 8. So these fall flatly within long-standing antitrust tradition. Third. You know, I know you have a bunch of points. The bottom line here, and one we have to try to understand, is precisely the theory. So is the alleged conspiracy to suppress competition with respect to repair coverage quality, or is it as to premiums, or what is it? Well, the conspiracy here is to exclude competition based on the quality of the insurance policy. Some people, for example, some people will want insurance, in household insurance, some people want insurance that gives you full cash value, some people want replacement value, costs different amounts, and people pay different amounts, and there's competition based on that. In auto insurance, somebody with a new car might want the highest quality policy where he gets all new parts. Somebody with an old jalopy might want a cheaper policy. But there should be a choice. The system is based on choice and competition. And the issue is that when you drive out, when you agree not to compete on certain things and drive out the higher quality policies, the demand goes up for the lower quality policies because there aren't any higher qualities. For example, if there were no color TVs, there would be more people who want black and white TVs. And standard antitrust economic analysis is that when the demand goes up for something, the price goes up, too, so that the price for the black and white TVs. Well, it depends. It's not just a demand function in antitrust economics. It's a question of supply as well. Yes, Your Honor. But the total number of policies available to customers is also being reduced here. That is where the harm is coming from. The harm is coming to the customers. And as a result, it's a natural thing. But it is another way of saying that, as you're just saying, that there's only one kind of policy available. That's right, Your Honor, that there's an agreement not to compete on the type of policy available. And under Knebbelbard, as I just cited before, that is equivalent to a price-fixing conspiracy. Can you walk you you mentioned or you argue in your brief that the consumers were injured because it was horizontal price-fixing and that was a per se harm to competition. Can you walk me through and explain why this type of conspiracy amounts to horizontal price-fixing? Yes, Your Honor. That there are many cases that say that price-fixing does not have to be just an agreement, like we're going to charge this amount to. And they can also include agreements that affect the supply so that, as the Knebbelbard decision says that I just cited, if you agree, well, we are not going to provide the high-quality parts. We're just going to say, these are the best policies where we just provide the low-quality parts and that's all we're going to provide and we're going to exclude competition on anything else. That that is equivalent to price-fixing, as many cases have said. And, in fact, that kind of conduct has been the subject of even criminal convictions. There's an American Radiator case that we cite in our brief where that was part of a criminal price-fixing conspiracy. Let me ask you to turn for a moment, if you would, to Walker and the language in the California Insurance Code under 1860 and 1860.1. Walker has some very broad language suggesting that the 1860.1 is analogous to the federal filed-rate doctrine. And so, so long as the insurance rates have been approved by the commissioner, it doesn't matter what sort of antitrust schemes were going on, you know, alleged conspiracies, they're not challengeable. And there's language to that effect very broadly in Walker. Why don't we say, regardless of your, if we agree with your conspiracy theory, the claims just are not cognizable under 1860.1? Well, I think it's important to look at the actual, the actual statements in Walker, that Walker critically did not involve any antitrust conspiracy. So the Walker case was not saying that it doesn't matter that there's an antitrust conspiracy. In fact, it said, it wasn't deciding the outer parameters. In Walker, the issue was, the only claim was that the rate charge was in violation of the insurance code and that the insurance commissioner was wrong in approving it, that the insurance commissioner didn't comply with the factors in the insurance code, and there was no other substantive violation. It was simply that there was a violation of the insurance code, and Walker found that the insurance commissioner is the decider as to whether something complies with the insurance code. So, therefore, it's reasonable to expect the insurance commissioner to be the person who you go to to decide that issue. And we're not going to second-guess that decision about whether it's in violation of the insurance code itself. But it was not deciding the issue of what happens when there is external conduct, when there's an antitrust conspiracy. It was only limited to the issue whether there was a cause of action under the, a substantive cause of action under the insurance code itself. And so you... But when you get to the end of the line, the premiums are set for particular kinds of policies, and wouldn't this require the insurance commissioner's involvement ultimately? It doesn't need to, because the analysis is very different. But the insurance commissioner is not allowed even to consider competition issues in approving rates. And that's on your... The insurance commissioner is not in the antitrust business. Exactly, Your Honor. And, in fact, that is statutorily codified at 1861.05a. It says, in approving the rate, the commissioner shall not consider competition, that the insurance commissioner will only consider, you know, certain factors about whether they're making enough money to, you know, to keep going, whether the insurance commissioner is making enough money to keep going, whether the insurance companies are harming their viability, things of that nature, and they're prohibited from looking at antitrust issues. So this language in Walker that says if Section 1860.1 has any meaning whatsoever, the section must bar claims based upon an insurer's charging a rate that has been approved by the commissioner pursuant to the amended McBride Act, I guess it's Chapter 9 or under Prop 103, are you saying that's a dicta or that it should be distinguished because they were looking at a different type of challenge to the insurance rates? Well, what they were talking about there was they were simply saying if your complaint is that the insurance commissioner didn't do his job and didn't apply the right factors under the insurance code, then your remedy is in front of the insurance commissioner. They were not deciding the issue of whether antitrust claims apply, and we believe that the Cellular Plus case, as endorsed by the Knebelbard decision, do do that. And, in fact, there is — You have less than two minutes. Oh, yes, Your Honor. Let me just quickly wrap up, if I may. If I may quote the Cellular Plus and Knebelbard decisions. They both — Knebelbard is quoting Cellular Plus. They both say, we find no compelling underlying logic or policy reasons for denying a Cartwright Act cause of action for treble damages to a person injured by reason of a price-fixing conspiracy, even if the fixed prices have been approved as reasonable by a regulatory agency. Now, there are just a — since there's limited time, just a few more points, if I may. Their claim that they're immune is based in large part on the view that rate refunds are prohibited. It's throughout their brief. But Fogel, a case we put in our supplemental authority, says rebates are not prohibited. And that's 160 Calat 4th at 1418. They also rely on immunity, as the Court has noted, from 1860.1, which is what was looked at in the Walker case, but the Donabedian case found that that provision only applies to certain — So are you claiming that consumers are overcharged? Absolutely, Your Honor. And so the remedy here is a premium refund? It's not a refund. It's damages. The Cellular Plus case, which was followed by Knebelbard, makes clear that simply looking at damages does not contravene the rate. It's simply looking at what the damages were from the actual anti-competitive conduct here that we believe clearly was not permitted by statute. There is nothing saying that they can exclude competition. And Donabedian says that provision that they rely on, that Walker relies on, doesn't apply to unilateral conduct, which would include rates. It only applies to certain kinds of joint conduct. And that's what we're trying to do here.  Thank you, Your Honor. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: McKeown, Ikuta, Block